IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CAROL MARTINEZ,
SOCORRO DOMINGUEZ, and
GWENDOLYN VAUGHN,

        Plaintiffs,

v.                                CIV 02-771 KBM/LCS

JIM TRUJILLO, acting in his individual and official
capacity as Police Officer of CITY OF LOVINGTON,
a Municipal Corporation, and GARY CLEMENS,
acting in his individual and official capacity as
SUPERVISOR OF EMERGENCY MEDICAL SERVICES,
CITY OF LOVINGTON, a Municipal Corporation,

        Defendants.

## MEMORANDUM OPINION AND ORDER

This controversy arose out of an anthrax scare. Plaintiffs allege that the defendant officers violated their civil rights and state law by the manner in which they were decontaminated before transport to the hospital. Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment.

Plaintiffs have settled with the New Mexico State Police Officer Jason Dougherty. *See Doc. 34.*[1] The matter is now before me on the remaining "Lovington" defendants' motion to dismiss for failure to state a claim or, in the alternative, motion for summary judgment on the

---

[1] In accepting Jason Daugherty's Offer of Judgment, Plaintiffs necessarily settled any claims they may have had against Defendant State of New Mexico because: (1) the State cannot be liable as a "person" under § 1983; and (2) the New Mexico Tort Claims Act would serve as the exclusive remedy for any state law tort claim. Indeed, Plaintiffs specifically state that "the "Lovington Defendants" are the only remaining Defendants in this case. . . ." *Doc. 38 at 1.*

issue of qualified immunity *(Doc. 25)*. Plaintiffs' different theories of recovery center around their Fourth Amendment claim, and Defendants' defenses focus on their contention that their conduct was objectively reasonable. I therefore begin my analysis with those arguments.

Since the claims and defenses necessarily require consideration of all of the circumstances, I reviewed all of the evidence submitted beyond the allegations in Plaintiffs' First Amended Complaint and apply the summary judgment standard for qualified immunity. The material facts underlying this case are essentially undisputed. Rather, it is the legal significance of the facts that comprises the controversy.

## I.  Background

Plaintiff Carol Martinez was the manager of Your Credit, Inc., located on South Main Street in Lovington, New Mexico. Plaintiff Socorro Dominguez was an employee at Your Credit, and Plaintiff Gwendolyn Vaughn was a customer at the business on the morning of November 6, 2001, the day in question. *Doc. 38,* Exh. A, ¶ 3 (hereinafter "*Martinez Aff.*"). The Court notes that the relevant events took place just weeks after the national "911" tragedy.

That day, Martinez opened a new box of pens purchased from an office supply store in Hobbs, New Mexico. When she took the cap off of one of the pens, out "came a white powdery substance" she had "never seen before." *Id.,* ¶ 4. The same was true of another one of the pens. She consulted with Dominguez and Vaughn about what the substance could be. Because of the "recent anthrax events in the country, [they] decided to call the local police as a precaution." *Id.,* ¶ 5.

Defendant Jim Trujillo, a Lovington police officer, was the first to arrive on the scene. *Id.,* Exh. D at 6 (hereinafter "*Trujillo Depo.*"). Trujillo likewise had never seen a substance like

that before. He immediately had another officer make calls to determine the origin of the pens, and they were told that the pens had not been tampered with by either the manufacturer or the distributor. *See id.* at 7-10. Concerned they were facing a possible hazardous materials situation, and perhaps anthrax, Officer Trujillo decided they should close the business, evacuate the building, and bring in the state police to assist. *Id.* at 10-11.

Former Defendant New Mexico State Police Officer Jason Daugherty responded to the request for assistance and took over supervision of the investigation when he arrived. *Id.* at 10; *see also id.,* Exh. B at 8-9 (hereinafter "*Daugherty Depo.*"). Trujillo briefed Daugherty on what had transpired, including that Martinez had developed a rash on her hand, Dominguez had developed a red and swollen eye, and Vaughn had developed a headache and nausea. Daugherty decided to evacuate and quarantine the building and entire block because his "concern at the time was life, was to secure the scene, isolate the material, whatever it is, get the individuals that were in contact with it treated by EMS personnel." *Id.* at 10; *see also id.* at 9.

To that end, Daugherty telephoned Defendant Captain Gary Clemens, who is a paramedic with the Lovington Fire Department Emergency Medical Services. *Id.* at 10-11; *see also id.,* Exh. C at 4-7 (hereinafter "*1/31/03 Clemens Depo.*"). He told "Clemens and everybody else there that until we know what it is, we need to treat it like it is the worst thing we could come into contact." Daugherty stated that there were "three things he wanted to accomplish" – shut down and evacuate the area, limit access to the area, and have the three women "treated and taken to the hospital" – and he wanted them "accomplished ASAP." *Daugherty Depo.* at 11. Daugherty specifically inquired whether Clemens had "hazmat" people and capabilities, or whether Daugherty needed to call the Hobbs Fire Department in order to have assisting personnel with

3

that specialized training. Clemens replied that he had certified hazmat people and a hazmat trailer. *Daugherty Depo.* at 67.

Clemens and other firefighters/paramedics were dispatched to the scene. They contacted the local hospital to alert it of the situation. The hospital advised fire department personnel that it would not accept the women for evaluation and treatment unless they first underwent decontamination. The hospital's position was relayed to other officials on the scene. *See Clemens Depo.* at 20; *Daugherty Depo.* at 21; *Trujillo Depo.* at 18; *see also Doc. 26,* Exh. A at ¶5 (hereinafter "*11/14/02 Clemens Aff.*").

Daugherty envisioned that the women thus had three options: (1) they could decline to be contaminated and seek treatment on their own; (2) they would be decontaminated by women firefighters in an isolated setting; or (3) they could enter the isolated area and hose themselves off. *Daugherty Depo.* at 20-22. However, Daugherty spoke to Clemens only about the second option. *See id.* at 20.

Daugherty "emphasized" several times his "personal opinion" that Clemens should use women firefighters to carry out the decontamination. *See id.* at 20-21, 24, 72-73. Daugherty wanted to use female firefighters because he was concerned about a later lawsuit if the substance turned out to be harmless. However, Daugherty did not tell Clemens that he kept mentioning female firefighters out of a concern about possible litigation. *Id.* at 47, 75. Trujillo also told Clemens to use women firefighters because he believed it was "inappropriate for a male to decontaminate a female." *See Trujillo Depo.* at 21-22; *see also id,.* at 17-19.

According to Clemens, the women firefighters were not on the scene at the time this conversation took place, and he advised Daugherty that women firefighters were on the way.

4

*Daugherty Depo.* at 25; *Clemens Depo.* at 24.  Clemens told Daugherty that "the people he had that were hazmat certified were males that were there at the scene," *Daugherty Depo.* at 21, and Daugherty testified that he believes Clemens also mentioned that he did not have "any female fire fighters that were hazmat certified," *id.* at 68.  *Id.,* at 21.

Given their conversation, Daugherty expected and believed Clemens would carry out his wishes and use female firefighters to do the decontamination, but he ultimately left "the decontamination . . . up to Captain Clemens." *Id.,* at 26; *see also id.* at 47-48, 72-73.  "[T]he whole purpose of incident command is for me to tell Captain Clemens this is what I want done, get it done.  It is his responsibility and authority to determine who he has do what." *Id.* at 67-68.  Because he was going back and forth dealing with others on the scene and contacting the Federal Bureau of Investigation, Daugherty did not actually observe how the decontamination was carried out.  *See id.* at 23, 26.

After speaking with Clemens, Daugherty and Trujillo went to speak with the plaintiffs.[2] The women knew that to be contaminated, they would have to take off their clothing in an isolated area and be hosed down.  *Daugherty Depo.* at 21, 25; *Trujillo Depo.* at 21.  Daugherty told them that they could choose to leave and seek treatment on their own, but that the hospital was not going to take them unless they were first decontaminated.  *Daughtery Depo.* at 21, 22, 24; *see also Clemens Depo.* at 35.  He told them that if they chose to leave, "they would have to sign a waiver and they would have to get treatment on their own." *Daugherty Depo.* at 24. Daugherty, as well as Trujillo, also told them, "assured" them, that women firefighters would be used for the decontamination.  *Id.* at 21-22; *Trujillo Depo.* at 21; *Martinez Aff.* at ¶ 6.

---

[2] The women did not ever speak directly to Clemens.  *See Martinez Aff.,* ¶ 7.

As I read the submissions, it is fair to say that the women were not pleased at the prospect of decontamination and reluctantly submitted to it. Plaintiffs, however, dispute that they were free to leave. According to the Plaintiffs' allegations and the affidavit one of them submitted in response to the motions, they were never told that they were free to leave. Further, Martinez asserts that in response to her request to leave, Trujillo told her she could not. *See First Amended Complaint,* ¶ 6; *Martinez Aff.,* ¶ 7.

Clemens estimated that twenty minutes passed between the time he learned that the hospital required decontamination until the decontamination was complete. During the twenty-minute period: the firefighters set up tarps around the fire truck and ambulance with another tarp in the middle; donned hazmat gear, which required taping around their wrists, legs, and face masks; and Plaintiffs disrobed and were hosed down one at a time. *Clemens Depo.* at 30, 57.

Clemens testified that he initially intended to use female firefighters to accommodate Daugherty's preference. *Id.,* at 25-26. Because Daugherty had expressed the need to get Plaintiffs "off of that premises right now" and because he believed the female firefighters were not on the scene, Clemens went ahead using hazmat certified male firefighters to perform the decontamination. *Id.* at 31; *see also id.* at 24, 32. According to Clemens, both of the women firefighters who ultimately arrived on the scene came after the decontamination had begun. *Id.* at 25-26. Clemens also testified that in retrospect, he "probably" would not have used the women firefighters for the decontamination even if they had been on the scene from the outset "because of their limited training" in handling hazardous materials. *Id.,* at 27.

Plaintiffs dispute that there were no women firefighters on the scene. They contend that two were present and had sufficient time to put on the hazmat gear before the decontamination

6

began.  *Martinez Aff.* ¶6; *see also Daugherty Depo.* at 87; *Trujillo Depo.* at 25.  There is no dispute, however, that Daugherty was facing an unprecedented situation,[3] treated the situation as a potential serious large-scale hazard,[4] made this known to Clemens,[5] and was pushing Clemens to act quickly.[6]

## II.  Standard of Review

If a defendant raises qualified immunity as the basis for summary judgment, the burden shifts to the *plaintiff* to show two things:  (1) a violation of a constitutional right, and (2) that the violated right was clearly established as of the date of the offending conduct.  The state law doctrines of privilege and waiver of immunity are irrelevant to this discussion.

As the Supreme Court directed in *Saucier,* the analysis of the two prongs is based on Plaintiffs' allegations and must be conducted in sequential order.  *See, e.g., Saucier v. Katz,* 533 U.S. 194, 201-02 (2001); *Roska v. Peterson,* ___ F.3d ___, 2003 WL 1963209 (10th Cir. 4/29/03) (to be published)*; Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1312 (10th Cir. 2002); *Roska v. Peterson,* 304 F.3d 982, 989 (10th Cir. 2002); *Holland v. Overdorff,* 268 F.3d 1179, 1185-86

---

[3]  *See Daugherty Depo.* at 27 ("basically we had to shoot from the hip and treat this as if it was an $H_2S$ incident or hazmat incident").

[4]  *See Daugherty Depo.* at 40 ("worst case scenario . . . 20,000 people falling dead in an hour").

[5]  *See Daugherty Depo.* at 40-41 ("I told him we are going to treat this as though these people have come in contact with something that could possible kill them, and we need to get them to the hospital to somebody that might know a little bit more about the chemical substance and be able to test these individuals to see what is going on.").

[6]  *See Daugherty Depo.* at 11 ("Basically I told Captain Clemens and everybody else there that until we know what it is, we need to treat it like it is the worst thing we could come into contact with."); *id.* at 26 ("I was constantly on Captain Clemens's – I don't want to say the wrong word, but I was on him pretty regular to say what is the delay?  We need to get this done, because the longer they are sitting here, the longer they are going without medical treatment.").

(10th Cir. 2001). In the Tenth Circuit, Plaintiffs' burden is described as "heavy" notwithstanding viewing the evidence favorable to them. "'[T]he record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity.'" *Holland,* 268 F.3d at 1186 (quoting *Medina v. Cram,* 252 F.3d 1124, 1128 (10th Cir. 2001)).

In the event a plaintiff successfully meets his or her burden under the two-part *Saucier* test, "then the burden shifts back to the defendant, who must prove that 'no genuine issues of material fact' exist and that the defendant 'is entitled to judgment as a matter of law.'" *Olsen,* 312 F.3d at 1312 (internal citation omitted). One Tenth Circuit opinion describes the burden shift as such:

> In the end, therefore, the defendant still bears the normal summary judgment burden of showing that no material facts remain in dispute that would defeat the qualified immunity defense. . . . When the record shows an unresolved dispute of historical fact relevant to this immunity analysis, a motion for summary judgment based on qualified immunity should be properly denied.

*Id.* A very recent Tenth Circuit opinion describes the burden shift differently. That is, if a plaintiff meets the burden of showing a violation under clearly established law, then the burden shifts to the defendant "to prove that [the] conduct was objectively reasonable under the circumstances." *Roska, supra* (considering factors of reliance of state statutes and advice of counsel).

### III. Analysis

#### A. Fourth Amendment Claim:<br>Plaintiffs Fail To Meet Either Prong Of The *Saucier* Inquiry

In their First Amended Complaint, Plaintiffs claim that they were "seized/detained" and for purposes of this analysis, I take that allegation as true. As such, the Fourth Amendment objective

8

reasonableness inquiry applies. Plaintiffs assert that the decontamination was unreasonable because the defendants did not know what substance the plaintiffs had encountered and because female officers could have carried out the decontamination. Plaintiffs have not cited any authority in support of their position.

Indeed, Plaintiffs argue only that because Officer Trujillo is of the opinion that female firefighters should have been used, not doing so was objectively unreasonable. *Doc. 38* at 16. They maintain that Trujillo "is familiar with requirements for a strip search in obtaining a female to conduct such search of a female suspect. These requirements were well known to him and the necessity to use females to decontaminate females was no different." *Id.* Yet, if Plaintiffs are suggesting there is a relevant written policy in place, they have not submitted it in response to Defendants' motion.

My independent research reveals no Fourth Amendment cases involving an emergency situation and a potentially hazardous substance, much less dealing with the issue of male-on-female decontamination for possible anthrax contamination in a public area. The most analogous cases, as Plaintiffs suggest, are the cross-gender strip searches in the arrest and prison setting. In those cases, while routine strip searches of pretrial detainees does not pass constitutional muster, a strip search based on "reasonable suspicion" can justify the strip search of a pretrial detainee as long as the scope and manner of the search is likewise reasonable under the circumstances.[7] Two factors are prominent in the cross-gender strip search decisions: an emergency *and/or* situation involving health and safety concerns, and privacy as to the place where medical personnel carry

---

[7] *See e.g., Skurstenis v. Jones,* 236 F.3d 678, 682 (11th Cir. 2000) (and cases cited therein, including decisions from the Tenth Circuit), *rehearing en banc denied,* 252 F.3d 444 (11th Cir. 2001).

out the strip search. When those factors are present, generally the courts do not find cross-gender searches or privacy violations unreasonable.[8]

This case presents an analogous situation to an emergency where medical personnel perform the strip/body search. Here, faced with an perceived emergency situation requiring immediate action to prevent a potential health crisis, among not only Plaintiffs but also the general population, Plaintiffs were subjected to a very brief and unpleasant decontamination by firefighters who are trained as paramedics and in dealing with hazardous materials. Given the post-911 timing of incident and the uncertainty and fear throughout the country at that time, I find it is no consequence that Defendants carried out the decontamination without first ascertaining the chemical composition of the substance in the pens.

The defendants erred on the side of caution, which is both understandable and laudable under the unprecedented circumstances, particularly since Plaintiffs were complaining of strange symptoms immediately after coming into contact with the substance.[9] Clemens was directed and reminded to move quickly and not delay. He did so. In this context, I find that it was objectively reasonable for Clemens to use any firefighter he chose at the time, be it male or female.

---

[8] *See id.* at 683-84 (and cases cited therein, including decision from the Tenth Circuit; holding that "it is not inappropriate for medical personnel to conduct a strip search of an inmate of the opposite sex . . . for body lice" on morning after prisoner was taken to jail for drunken driving and hours before she was released); *see also e.g., Oliver v. Scott,* 276 F.3d 736, 745 (5th Cir. 2002) ("We twice have found that security concerns can justify the strip search of a male inmate in front of female guards."); *Johnson v. Kalamazoo,* 124 F. Supp. 2d 1099, 1103-06 (W.D. Mich. 2000) (requiring male pretrial detainees to strip to underwear and remain so clothed in view of female officers for a short period to ascertain suicidal tendencies did not violate Fourth Amendment or Due Process).

[9] Compare the situation where plaintiffs complained that the government's response to an anthrax scare was inadequate. *Smith v. Potter,* 187 F. Supp. 2d 93 (S.D.N.Y. 2001); *Massone v. Reyna,* 2002 WL 31016643 (S.D.N.Y. 9/10/02).

Now knowing that Plaintiffs were not exposed to toxic material, in hindsight the police and emergency services provided by local and state government was entirely unnecessary. Thus, in retrospect, the rush to decontaminate likewise was unnecessary, and Clemens could have taken time to secure female firefighters and train them on how to perform the decontamination. ***The test, however, is objective and viewed at the time of the events under all of the circumstances.*** I therefore find no violation under the Fourth Amendment or Due Process, be it an Eighth Amendment-type analysis or a substantive due process analysis.[10]

Absent a constitutional violation, there can be no municipal liability. *E.g., Trigalet v. City of Tulsa, Oklahoma,* 239 F.3d 1150, 1154 (10th Cir. 2001). Furthermore, Plaintiffs tender no evidence whatsoever that Clemens or any other named defendant was a final policymaker for the Lovington municipalities separately named as defendants.[11] Finally, violations of state law do not give rise to a federal cause of action under § 1983. *E.g., Malek v. Haun,* 26 F.3d 1013, 1015-16

---

[10] Substantive due process is not necessarily a catch-all claim. Where, as here, the claim is based on an unlawful seizure/detention, substantive due process provides no alternative theory of recovery. *E.g., County of Sacramento v. Lewis,* 523 U.S. 833, 843 (1998) ("*Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eight Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process"); *United States v. Lanier,* 520 U.S. 259, 272 n. 7 (1997) ("if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."); *Roska, supra* (substantive due process standard applies to claims of excessive force arising outside of the context of a seizure); *Ellis v. City of Lindsay,* 1998 WL 879818 (10th Cir. 1998) (same).

[11] *See Crownover v. City of Lindsay, Oklahoma,* 2000 WL 1234852 (10th Cir. 2000) (after arresting the plaintiff's husband, officer returned hours later to house and "strip searched" her; as for municipal liability, court held: "Thus, although Officer Holloway held an advanced level position within the police department, was the most senior police officer on duty the night he conducted the improper search of plaintiff, and may have had some clerical responsibility to keep the police manual current and in good condition, this is insufficient to raise a genuine issue of material fact regarding whether he had any final policymaking authority of the City.")

(10th Cir. 1994). Accordingly, Plaintiffs fail to carry their heavy burden on the first prong.

Moreover, "[f]or the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other court must be as plaintiff maintains." *Farmer v. Perrill,* 288 F.3d 1254, 1259 (10th Cir. 2002). Although the "very action in question" need not be previously held unlawful, Defendants are entitled to qualified immunity unless "in the light of preexisting law the unlawfulness [of the officers' conduct is] apparent." *Id.; see also Hope v. Pelzer,* ___ U.S. ___, 122 S. Ct. 2508, 2516 (2002). Based on the discussion and authorities above, coupled with the absence of any citation to authority by Plaintiffs, they fail to meet their burden on the second prong as well. Accordingly, summary judgment will be entered in favor of the individual defendants on the issue of qualified immunity and in favor of the municipal entities on Plaintiffs' federal claims.

### B. Court Declines Supplemental Jurisdiction Over Remaining State Claims

Plaintiffs' First Amended Complaint and response to Defendants' motion focuses on their state claims for assault, false imprisonment, and the tort of outrage. I decline to retain supplemental jurisdiction over them. *E.g., Villalpando v. Denver Health and Hosp. Auth.,* 2003 WL 1870993 (10th Cir.) (4/13/03) (if parties "have not shown they have spent a great deal of time on the state law claims, the district court should normally dismiss supplemental state law claims after all federal claims are dismissed . . . before trial. . . .   Courts should be cautious when exercising supplemental jurisdiction over state law claims because [n]otions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary.") (internal quotations and citations omitted).

Wherefore,

12

**IT IS HEREBY ORDERED AS FOLLOWS:**

1. Defendants' motion *(Doc. 25)* is GRANTED IN PART;

2. Summary judgment is entered in favor of the individual defendants on qualified immunity grounds and in favor of the municipal entities on Plaintiffs' federal claims;

3. In light of the settlement with the state defendants, an earlier, separate motion to dismiss *(Doc. 22)* is DENIED AS MOOT;

4. The Court declines to exercise supplemental jurisdiction over the remaining state claims; and

5. A final order dismissing this action will enter concurrently herewith.

_____
UNITED STATES MAGISTRATE JUDGE
Presiding by consent.

13